I'm Robert Jobe, and I'm appearing today on behalf of the petitioner, Mahdi Shaban. It seems to me that this Court's review of the immigration judge's negative credibility finding in this case is complicated by three factors. First, the immigration judge in this case was bullying and intimidating, inappropriate through much of the hearing. I think that affected the ultimate credibility determination. Second, the immigration judge, Mr. Shaban's corroborating witness, and even the translator were speaking in somewhat broken English, which makes the transcript very difficult to understand in large part. And third, this particular transcript is rife with mistranscriptions or critical passages that are just left as undecipherable. Let me ask you about two things which, and you tell me that they were subject to the infirmities you just described. One is that on his petition, where it asked for religion, he checked Muslim. Is that correct? He did, yes. And that's not subject to translation problems? I don't believe that that's subject to any of the problems that I just pointed out. But that... And the second thing that sort of sticks in my mind is that the witness, the Jehovah's Witness instructor who testified, said that your client did not tell him that he was Muslim. He did not tell him of his earlier conversion in Jordan to Christianity. Is that right? Yes. Let's just take those two things, which appear to be undisputed. Yes. Why couldn't a rational trier of fact look at those two items and come to the conclusion that the story about Jordanian conversion was made up? Let me take them in turn. On that first point, I mean, first you need to examine the asylum application. And this begins at page 224 of the administrative record, and it goes on through page 230, I believe. On the cover sheet, it asks for religion. And there, when he arrived here in the United States, two weeks after he arrived, he filed this application, and on that form it says Muslim. But if you go into the form, where it begins to actually ask you questions about your asylum claim. For example, why are you seeking refugee status? Why are you seeking asylum? What would happen to you if you went back? He says no fewer than seven times, I converted from Islam to Christianity. It's obvious that the cover sheet contains a mistake. And he says as much. And the other thing about this particular point is that he corrected the application before he was sworn to it. Okay. Let's discount that. Let's take your point for purposes of argument as given. Why couldn't a rational trier of fact look at those two items and come to the conclusion that the story about Jordanian conversion was made up? Why couldn't a rational trier of fact look at this witness, which the petitioner called, right? The instructor? Yes. Who testified under oath that your client did not reveal the Jordanian conversion to Christianity during their discussions. Why couldn't a rational trier of fact say the reason he didn't tell him is that it didn't happen? We don't know why he didn't tell him that, Your Honor. There's no indication that he was ever asked by the witness. Well, wait a minute. That's sort of shaving it a little bit. Because the witness says specifically that he didn't know anything about the Bible, the way he presented it. He didn't know Jesus Christ was, particularly why he was called God. He didn't know any of the basics of Christianity. And his whole point is, isn't his whole point, I'm living in a Muslim society, basically, and I'm Muslim. And if I convert, it's serious, it's unacceptable, it'll tear me away from my family, it's drastic, it's all kinds of terrible things, and yet I converted and didn't know a thing about Christianity. That's a little hard to swallow, isn't it? I disagree with some of the characterization. I need to go to the transcript, if I can. The immigration judge found that he was not forthcoming in describing his experience with Christianity. I simply think that's wrong, in large part. First, this begins on page 94 of the transcript. And again, we're dealing with passages that are almost entirely indecipherable. But this is in the middle of page 94. It begins at line 11, where the witness is saying, well, he told me that he didn't know Jesus Christ. He said that he, since he, indiscernible, he wanted to follow one of the Christian denominations, but he doesn't, indiscernible. When I started studying the Bible, he said, this one is different than other denominations that I knew for, so he continued. I mean, that passage makes clear, insofar as it's decipherable, that Mr. Chabon had some familiarity with Christianity, and he was suggesting that this witness denomination is different from the denominations that he previously had contact with. Those are all interesting arguments to make to a trier of fact, but that witness also said things like, well, one of the questions, he said, why do you say Jesus is the Son of God? Who is God? Your Honor, he never said who is God. The immigration judge says that in his decision, but the witness never said that. Mr. Chabon never said that. He never said who is God. That particular phrase comes from a question posed by the trial attorney, counsel for the government, and his response was, yeah, his questions were fundamental, but there's nothing to suggest that he ever asked that question. I'm sorry. I'm sorry. Who is the witness? The witness is somebody from his Bible class. Mr. Dabur. Mr. Who? Dabur. Dabur. Okay. Question to him. When you say he had a lot of questions about Jesus and God because it was totally new to him, what does totally new mean to you? Well, this is one of the questions that he said. Why do you say Jesus is the Son of God? So I had to explain that to him. Who is God and all that thing that he knew about Christianity from a point of view of the Muslim? So I tried to explain it to him from the Bible. So the first few times you met him, it was very fundamental questions like who is Jesus and who is God? Yeah, very fundamental. That doesn't sound like the I.J. That sounds to me like it's the witness. No, I'm not saying it's the I.J., Your Honor. It's the question. You just said that the I.J. said it in his opinion, but that was not what the witness said. I.J. does say that in his opinion. That's not my interpretation of what the witness is saying here. This is a question from the trial attorney saying who is God. But the only thing that's in this passage that's clear that Mr. Chabon asked the witness is why do you say Jesus is the Son of God? That's the only question that he directly is quoted as asking in this transcript. I'm sorry. In the transcript, the answer has him also saying who is God and all that. Who is God? So I had to explain that to him. Sir, do you have a different transcript? I have a transcript that's at page 96. Your Honor, do you see a question mark there? Because I don't. What it says is, it asks why do you say, he said, why do you say Jesus is the Son of God? So I had to explain that to him. And it goes on, not with a question mark, who is God and all that thing that he knew about Christianity. That's not an interesting argument, but I'm failing to see why a trier of fact has to accept your spin on that argument. Well, let me just run through the other passages in the transcript that I think are relevant on this point. It continues on to page 97, something, again, the immigration judge simply ignored. He was asked, the witness was asked, from the trial attorney or the judge, so he just didn't know anything about Christianity at this point. And the answer is, this is on page 97, line 5, well, he told me that he knows something about Christianity and he loves to be and he wants to be a Christian. He wants to study the Bible. And then on page 89, we get into the issue of the conversion. You know, the immigration judge faulted him for not telling, not offering to Mr. Dabur the fact that he had converted in Jordan. But there's no reason to believe that he would offer that to him or that it was solicited. But on this point, Mr. Chabon's lawyer asks, okay, has Mr. Chabon told you anything of what happened to him while he was in Jordan? Objection. The answer, yeah, he tried to tell me. Objection. What's the objection? It's not relevant. It would be double hearsay at this point. So the issue raised here about what happened to him in Jordan, the conversion and all the aftermath of that, was cut off right here in the testimony by the government and the judge sustained that objection. In summary, I think the only real question that we have here, him quoted as saying, is why do you say that Jesus is the Son of God? This other stuff is the witness sort of paraphrasing what he instructed Mr. Chabon about. And we can't infer from that that Mr. Chabon had no knowledge, because he directly informed Mr. Dabur about his study of religion or his familiarity with some of the religious denominations in Jordan. And he directly informed Mr. Chabon, Mr. Dabur, of his desire to practice Christianity. I want to focus on some of the other issues raised by the immigration judge here. I want to talk about, for example, the date of conversion. At this point, the immigration judge thought this was to be a highly significant fact, because he said, Mr. Chabon had an astonishingly difficult time recalling why he converted to Christianity. It's simply not true. This is on page 115 of the transcript, and he was asked, when did you change your religion to Christianity? He said, 1995. And then he went on to say, in about 1995. The judge says, well, why do you say about 1995? And he goes on to say, well, I had it in my mind from the time I started reading the Bible that I would be in this faith. And then the judge says, well, when did you become Christian? 1995. And he continues to say 1995. You need to wind up on this point. Okay. Yes, Your Honor. Moving on. You need to wind up, period. You're 30 seconds over your time. Thank you. May I please the Court? My name is Jennifer Lightbody, and I represent the Respondent. The record evidence in this case does not compel the conclusion that the petitioner was credible, where he provided testimony that was internally inconsistent, where his testimony was undermined by his own witness' testimony, and where his testimony was inconsistent with the Department of State's advisory opinion, and where his testimony was inconsistent with his asylum application. The I.J. was pretty heavy-handed here, wasn't he? Well, Your Honor, that is the petitioner's version of what had transpired, but actually, it's the government's position that the immigration judge was not credible. The immigration judge was looking for background information that the attorney had not started out asking the petitioner. In other words, when petitioner's counsel started to examine the witness, the petitioner, she started out asking him questions about his religion, and when he became a Christian. There was no background information, and it was clear from a review of the record that the immigration judge was enlisting background information with respect to where the petitioner was born, when he came to the United States, his education, his military service, information about his family. All of this type of information is typically elicited from a petitioner in an asylum hearing, and so it wasn't as if, in the case of Komenar, where Judge Hopkins, you observed that the immigration judge was not a neutral fact-finder. He refused to let the petitioner testify about what had happened to him. That's not the case here. The immigration judge was asking him specific questions about background information, and he wasn't denying him a full and complete opportunity to present his case. He did jump in after four questions, didn't he? Well, he did jump in, but the petitioner asserts that, I mean, he says petitioner's counsel asked no more than four questions. And the IJ interrupted the proceedings and declared that he had already made his decision. And actually, petitioner's counsel contradicts himself earlier in his brief, saying that, or acknowledging that the IJ had cross-examined, or examined, rather, the witness from page 116 to 134. He didn't just, the immigration judge didn't just allow counsel to ask four questions and cut him off and said, that's it. Well, it is correct that the petitioner counsel asked four questions. The immigration judge began asking questions, and when the immigration judge was through asking his questions, announced that he was prepared to deny the petitioner. That is true, but... Or, you know, the petitioner's attorney had an opportunity to complete his questioning. That is true, but then... Does that suggest bias? Actually, it's the government's position that it does not, because what happened after is significant. Counsel for the petitioner objected. The INS counsel agreed that the petitioner had not had an opportunity to present some of his questions, and what happened was... I noted that from the transcript, and whoever represented the government at the hearing should be commended for having the courage to do that. It's the right thing to do. And the immigration judge then took a recess for five or ten minutes, came back, counsel had objected again... I come from, we call that backing off. And that's what the immigration judge did, Your Honor, and came back and granted the petitioner's counsel's request to ask questions. And what's interesting from that is that... That's the record, isn't that the sense that you have from this? Well, what happened then, it's interesting, because the questions that petitioner's counsel asked were questions about what happened in the October attack, his attendance at church, he asked him, or she asked him to identify documents, qualified him for voluntary departure. She didn't ask him any questions that went to the adverse credibility issue. So the petitioner's counsel had an idea that this was going to be an adverse credibility finding. I mean, the INS attorney said, you know, we agree that petitioner's counsel hasn't had an opportunity to present his case, but it's clearly an adverse credibility. And counsel for petitioner didn't ask any questions to direct it at his lack of credibility. And, in fact, just asked him some routine questions. And then, interestingly, the immigration judge didn't render an oral decision at that time. The hearing was held in March, and the immigration judge didn't issue a decision until May, some two months later. And so the... And stated that he had considered the record. So it's not as though the immigration judge just decided the case right then and there. There was an opportunity to reflect on what had happened. Counsel was permitted to ask questions and did ask questions, but none of those went to the petitioner's credibility. And so it's the government's position that what the immigration judge did and what occurred here didn't deny the petitioner a fair hearing. It actually ensured that the petitioner had a fair hearing, because it elicited background information. I find that hard. I just find that part of your argument hard to accept, because part of a presentation is the ability to craft it in the way that you choose to craft it, and you rise or fall on it. But when a judge or a hearings officer or immigration judge takes over the hearing, and it becomes an interference with the way you want to present your case, there's no requirement that you have to start with background information, and many people feel that you ought to. The background information is in the application. You may want to get to the heart of the claim so you don't want to waste the judge's time. It's a matter of persuasion. So maybe I'm misinterpreting what you're saying, but you seem to be saying that the petitioner's counsel was doing something improper by not starting off with background information and that the IJ somehow righted the ship and got things going. I'm not trying to suggest that there was some type of ineffective assistance of counsel on behalf of the petitioner in any way. I'm suggesting that what happened was they started out asking questions specifically about religion without getting some background information about where he came from, when he had, well, I guess they actually did ask when he converted to Christianity, but just some basic background information. And the petitioner hasn't shown that there was some harm by the immigration judge doing that, that those weren't questions that counsel was going to ask. And again, when given the opportunity to ask petitioner questions, counsel didn't ask questions specifically directed at his credibility, to revive him to show that he was credible, when in fact the record shows he was not credible. Regardless of how this case comes out, do you have any way of getting feedback to these people, like the immigration judges? Because I have a sneaking suspicion I've seen this immigration judge before, and he is relatively heavy-handed. Is there any way that the government has of getting feedback to that organization and saying, well, look, you've got to shape these people up, because we're going to start losing all of our appeals if you don't. In any way, it's not fair to litigants. Your Honor, I don't actually know the answer to your question, but I will certainly raise that with the director from our office about the court's concern, and particularly with respect to this immigration judge. You know, judges often give tentative rulings and things. That's not unusual in civil practice to get some kind of tentative ruling, but there are some folks that are a little bit rough. We know there are some district judges that are rougher than others, and there are some IJs that are, too. We can talk to district judges through our opinions very directly. It might be a little harder for us to talk to IJs than it is, say, for the government. I will certainly check into that, Your Honor, if you would like me to provide you with whatever information that I want to take. I have great confidence you're going to follow. You needn't. I'll leave it to you to do what's right. Okay. Thank you, Your Honor. Tapes of the argument are available. You can get a copy, download it within a certain period of time off the Web, and just have somebody in a position of responsibility listen to the tape of this argument and the next case you're going to argue. I will certainly do that, Your Honor. To return to the point and to emphasize it, I don't think that you would take the position that if an IJ said, you know, I really don't like the way Petitioners put on their case. I'm going to have the government cross-examine to start off every hearing, and then we'll see if the witness can be rehabilitated. I don't think you would agree that that would be proper procedure. And in essence, that's what the immigration judge has done in this case and others, which is to take it over, cross-examine, attack credibility, and then say, okay, I've made a decision, but if you want to put anything. In essence, yeah, if you want to put anything on, that's one way of looking at it. Go ahead. And that does seriously interfere, in my view, with a proper presentation of a case. It would be the government's position that your example, Your Honor, would be significantly different. That's where the other side is questioning. And in this case, it was the immigration judge who is a neutral fact finder. And, by the way, we understand that IJs may have more of an obligation to develop a record than, say, trial judges do. Because I think sometimes we say, well, it's the IJ's obligation to make sure the record is developed properly. So we understand that. But there are ways of doing it, and there are ways you shouldn't do it. Thank you, Your Honor. Okay. Thank you for your argument, counsel. Thirty seconds, Mr. Jobe. You're done? Okay. Thank you. The case just argued will be submitted for decision. And we'll proceed to the next case on the calendar.
judges: Fernandez, Hawkins, Thomas